UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JOHN C. NELSON,

                Plaintiff,

v.

THYSSENKRUPP MATERIALS NA, INC.,

                Defendant.

CASE NO. C11-5317BHS

ORDER GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

This matter comes before the Court on Defendant ThyssenKrupp Materials NA, Inc., d/b/a/ TMX Aerospace's ("TMX") Motion for Summary Judgment (Dkt. 42). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On April 1, 2011, Plaintiff John Nelson ("Nelson") filed a complaint in Pierce County Superior Court alleging TMX violated the Washington Law Against Discrimination ("WLAD"), RCW 49.60, the American's with Disabilities Act ("ADA"), 42 U.S.C. 12101, *et seq*., and the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. 621, *et seq*.  Dkt. 3-1 at 7-8.  TMX removed the matter to this Court on April 22, 2011 on the basis of federal question and diversity jurisdiction.  Dkt. 1.  On February 07, 2013, TMX filed a motion for summary judgment.  Dkt. 42.  Plaintiff filed a response on February 25, 2013.  Dkt. 46.  TMX then filed a reply on March 01, 2013.  Dkt. 49.

## II. FACTUAL BACKGROUND

Defendant TMX has seven warehouse facilities in Auburn, Washington.  Dkt. 44 at 1.  In May 1999, Nelson, who was born on March 20, 1948, began working for TMX as a maintenance technician and later that year assumed the maintenance supervisor role. Dkt. 45-1 at 6, 24, 27.  Nelson supervised between one and four maintenance technicians who were responsible for keeping the plant equipment running.  *Id*. at 29-30, 32.

While maintenance supervisor, Nelson's superiors documented a number of job performance issues, and in January 2006, Nelson was placed on a performance improvement plan as a result of his unacceptable performance.  *See* Dkt. 45-2; 45-3; 45-4.

In January 2008, TMX approved Nelson's request to take a nearly six-month medical leave of absence due to coronary artery disease.  Dkt. 45-1 at 33.  Upon returning to work on June 16, 2008, Nelson was restored to his maintenance supervisor position. *Id.*  TMX accommodated Nelson's need to temporarily work a modified part-time schedule of four days a week, five hours a day, which was supported by a doctor's note. *Id.* at 38-39.  Subsequently, on July 15, 2008, Nelson submitted another doctor's note indicating he could work 40 hours a week without restrictions.  *Id.* at 33.

1    In December 2008, a new plant manager, Suzanne Schumacher, and new

2    operations manager, Michael Laurion, assumed overseeing the Auburn plant.  Dkt. 44 at

3    1-2.  Schumacher and Laurion were expected to implement improvements to the plant's

4    efficiency and productivity.  *Id.* at 2.  Schumacher met with Nelson soon after becoming

5    plant manager and requested he establish a preventive maintenance program.  *Id.*

6    Plaintiff failed to comply with Schumacher's directive, so she again met with him to find

7    out if he needed any assistance in establishing the program.  *Id.*  He indicated that he did

8    not need help, but thereafter continued to fail to establish the preventive maintenance

9    program.  *Id.*

10    Schumacher and Laurion observed that Nelson did not meet his job's

11    requirements, including necessary communication and computer skills, and thus the

12    decision was made to remove Nelson as maintenance supervisor.  *Id.*  Nelson was

13    notified of the decision on January 2, 2009.  Dkt. 45-1 at 20.  The position was assigned

14    to John Littau, Nelson's former subordinate.  *Id.*  Nelson's reassignment did not result in

15    any change to his work schedule or decrease in pay.  Dkt. 45-8 at 3-4

16    On January 5, 2009, Nelson sent an email at 6:25 a.m. to TMX HR manager,

17    Karin Edenholm ("Edenholm") and various other TMX managers, complaining about

18    being demoted. Dkt. 45-1 at 20.  Plaintiff's email did not complain about age

19    discrimination.  *Id.* at 25.  Edenholm investigated Nelson's concerns and confirmed the

20    performance-based reasons for his demotion.  Dkt. 45-12.  Later that same day, Nelson

21    sent another email to Edenholm requesting a job description for his new position, which

22

he planned on sharing with his doctor.  Dkt. 45-1 at 27.  Edenholm emailed the job description to Nelson on January 7, 2009.  *Id.*

Nelson requested and obtained a medical note dated January 8, 2009 from his doctor which specifically indicated he was "not to work greater than 40 hours/week and 8 hours/day."  Dkt. 45-13.  TMX accommodated Nelson's hour restrictions and provided him with a memo indicating that his hours would be limited to 40 hours per week, 8 hours per day.  Dkt. 45-15.

On January 13, 2009, Nelson submitted a completed form requesting FMLA and/or STD medical leave of absence, with that leave commencing that date with an expected return to work date of April 13, 2009.  Dkt. 45-12 at 4, 6.  TMX approved his request for that leave of absence.  Dkt. 45-1 at 29, 32.  On May 4, 2009, Nelson returned to work without restrictions to his position, pursuant to a note from a doctor stating that he had "[n]o restrictions for his job."  Dkt. 45-16.

During the summer of 2010, Nelson was working on the first shift and his hours had been from 4:00 a.m. to 12:30 p.m. for approximately six months.  Dkt. 45-1 at 24.  The second shift operated from 1:30 p.m. to 10:00 p.m. and it was normally worked by maintenance technician, Matt Riehm, who was hired in 2008.  *Id.* at 36.  In late summer of 2010, Littau determined that Riehm needed to move to day shift to get some further training opportunities and that he had to move someone temporarily to cover his shift.  Dkt. 45-9 at 4.  The schedule change was anticipated to last six to eight weeks.  *Id.* at 8.  Littau assigned Nelson to Riehm's second shift.  *Id.* at 5.  Nelson did not tell Littau he could not work the second shift due to health reasons.  *Id.* at 8.

1    On August 3, 2013, Nelson met with his doctor and told him that his medication

2    was making him "really tired in the afternoon" and that he "twice had run off the road"

3    with his vehicle and "once got stopped for a DUI but hadn't been drinking."  Dkt. 45-1 at

4    41.  A few days later, Nelson picked up a doctor's note dated August 3, 2010 which

5    stated:

6        To Whom it May Concern:

7        I have been John Nelson's physician since 1992.  In the interim, he has
         been generally healthy, but approximately two and a half years ago, he
8        developed significant coronary artery disease and had stents placed in his
         coronary arteries x three.  He has been followed by a cardiologist since that
9        time in addition to myself.  He also has glucose intolerance and the need to
         carefully watch his caloric and sugar intake to avoid more definitive
10       problems with diabetes.  Because of this, working shifts other than a
         standard day shift are definitely detrimental to his health as they would be
11       with any other patient with significant artherosclerotic disease or diabetes.
         We would, therefore, suggest that for medical reasons John work traditional
12       day shift, and that he avoid if at all possible swing and graveyard shifts.

13   *Id.* at 42; Dkt. 45-17.

14       According to Nelson, on August 13, 2010, he provided the doctor's note to then-

15   operations manager Don Atchley ("Atchley"), who was not his direct supervisor.  Dkt.

16   45-1 at 44.  Atchley indicated that he would send an email to Schumacher and the on-site

17   HR coordinator.  *Id*.  Nelson did not personally contact Schumacher, the HR coordinator,

18   or anyone else about the doctor's note or any need to change his shift after talking to

19   Atchley.  *Id*. at 45.

20       After Atchley informed Schumacher and the HR coordinator of the doctor's note,

21   they concluded that the note was not mandatory and that Nelson was only temporarily

22

ORDER - 5

1    assigned to the second shift to allow Riehm to receive training and evaluation.  Dkt. 45-
2    20 at 4.

3          On September 7, 2010, 25 days after Nelson gave the doctor's note to Atchley, he
4    provided Schumacher with a letter of resignation stating he was resigning on September
5    16, 2010.  Dkt. 45-1 at 47.  After giving that notice, Nelson worked until September 16,
6    2010.  *Id*. at 46.  In his resignation letter, Nelson gave two reasons for resigning: (1) a
7    hostile work environment and (2) that it "has been three weeks" since he had provided
8    the doctor's note and "to date I have received nothing back from management."  *Id*. at 47.

9          Schumacher contacted the corporate HR manager who immediately attempted to
10   contact Nelson by phone.  Dkt. 43 at 2.  On September 10, 2010 Nelson participated in a
11   conference call with the on-site HR coordinator and the corporate HR manager, Michelle
12   Ramsey.  *Id*. at 3.  The purpose of the conference call was to convince Nelson to remain
13   employed with TMX and discuss the concerns raised in his letter.  *Id*.  The HR manager
14   assured Nelson that he would immediately be returned to the day shift.  *Id*.  Nelson
15   refused to withdraw his resignation, even though that resignation was not effective until
16   September 16, 2010.  *Id*. at 3-4.  On September 16, 2010, Nelson voluntarily left his
17   employment with TMX.  Dkt. 45-1 at 46.

18         On October 7, 2010, Nelson filed a charge of discrimination against TMX with the
19   Washington State Human Rights Commission ("WSHRC") claiming that his demotion
20   was discriminatory on the basis of his age and purported disability, which he identified as
21   coronary artery disease.  Dkt. 45-18.  The WSHRC denied Nelson's claim because the
22   discrimination charge was untimely filed.  Dkt. 45-1 at 51.

# III. DISCUSSION

**A.      Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630.  The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically

1   attested by that party contradict facts specifically attested by the moving party.  The

2   nonmoving party may not merely state that it will discredit the moving party's evidence

3   at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

4   *Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

5   nonspecific statements in affidavits are not sufficient, and missing facts will not be

6   presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

7   **B.     TMX's Motion for Summary Judgment**

8          Nelson alleges that his demotion in January 2009 violated the ADEA.  Dkt. 3-1 at

9   8.  In addition, he alleges a failure to accommodate claim under the ADA and the WLAD

10  based on his allegations that he was not reassigned to first shift in August 2010.  Dkt. 3-1

11  at 7.

12  **1.     Federal Claims Under ADEA and ADA**

13         It is well-settled that "[t]he filing of an EEOC charge is a prerequisite to bringing a

14  civil action under the Age Discrimination in Employment Act (ADEA)."  *Albano v.*

15  *Schering-Plough Corp.*, 912 F.2d 384, 368 (9th Cir. 1990); 29 U.S.C. § 626(d).

16  Similarly, a plaintiff must file a timely charge of discrimination with the EEOC as a

17  prerequisite to maintaining an ADA action.  *See* 42 U.S.C. § 12117(a) (incorporating the

18  enforcement procedures set forth at 42 U.S.C. § 2000e-5).

19         In order to be timely, a complainant must file a charge with the EEOC within 180

20  days of the last act of alleged discrimination, unless the complainant initially institutes

21  proceedings with a state or local agency, in which case the EEOC charge must be filed

22  within 300 days of the alleged unlawful practice.  29 U.S.C. § 626(d); 42 U.S.C. § 2000e-

5.  As this Court has noted, failure to timely file an EEOC charge is treated as a violation

of a statute of limitations.  *Parker v. Makah Tribal Council*, 2012 U.S. Dist. LEXIS

99890, *2 (W.D. Wash. July 18, 2012).  If an EEOC charge is filed outside that

prescribed time period, the plaintiff cannot pursue a civil action under the ADEA or

ADA.  *See Santa Maria*, 202 F.3d 1170, 1176 (9th Cir. 2000) (*overruled on other

grounds by Socop-Gonzalez v. immigration & Naturalization Serv.*, 272 F.3d 1176, 1194

(9th Cir. 2000)); *Sanchez v. Pac. Powder Co.*, 147 F.3d 1097, 1099 (9th Cir. 1998).  Each

discrete incident of discrimination "constitutes a separate actionable 'unlawful

employment practice' for which a separate Charge of Discrimination must be filed."

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).  Application of these

principles here makes it clear that Nelson's ADEA and ADA claims are time barred.

    Nelson's January 2009 demotion is admittedly the sole basis for his ADEA claim.

Dkt. 45 at 16.  Nelson filed a discrimination charge with the WSHRC on October 7,

2010, admittedly alleging only that his January 2009 demotion constituted discrimination

on the basis of his age and claimed disability.  Dkt. 45-1 at 16-17.  That claim was made

more than 300 days after the demotion.  Nelson's ADA claim is based on an alleged

failure to accommodate to reassign him to the first shift in August 2010.  Dkt. 45-1 at 59.

In his October 2010 WSHRC charge, Nelson admittedly did not allege a failure to

accommodate claim, including the alleged failure to reassign him to the first shift which

is the subject matter of his ADA claim in this case. Dkt. 45-1 at 53.  The WSHRC

recognized that Nelson's stale claim regarding his January 2009 demotion fell outside the

300-day filing period.  The fact that Nelson never filed a charge of discrimination with

1   the WSHRC or EEOC regarding the alleged failure to accommodate in August 2010 is

2   evidenced by his verified complaint which contains no allegations of such a filing, and

3   furthermore by his response to TMX's motion for summary judgment which also wholly

4   fails to address or rebut TMX's argument that Nelson's claims are time-barred.

5        Nelson's failure to timely file a charge of discrimination with the EEOC

6   concerning his ADEA claim, and his complete failure to file a charge of discrimination

7   with the EEOC concerning his ADA claim bars his ADEA and ADA claims as a matter

8   of law.  Those claims are hereby dismissed.

9        **2.      State Claims Under WLAD**

10       Nelson claims that TMX failed to accommodate his alleged disability by not

11  returning him to the first shift in violation of the WLAD.  Dkt. 3-1 at 7-8.  Unlike the

12  ADA which requires an aggrieved employee to first file a complaint with the EEOC

13  before pursuing an action in court, the WLAD does not have a similar requirement.  *See*

14  R.C.W. 49.60.230 ("Complaint may be filed with commission").  Furthermore, WLAD

15  does not contain its own statute of limitations period.  *Antonius v. King County*, 103 P.3d

16  729, 733 (Wash. 2004).  Claims brought under WLAD "must be brought within three

17  years under the general three-year statute of limitations for personal injury actions."  *Id.*;

18  RCW 4.16.080(2).  Because Nelson's WLAD claim is predicated on TMX's failure in

19  September 2010 to return Nelson to the first shift, the filing of this suit in April 2011 is

20  well within the three-year statute of limitations.  Consequently, the WLAD claim cannot

21  be dismissed on those grounds.  The Court must, therefore, determine if Nelson has made

22

1  a sufficient showing on all elements of the prima facie case of failure to accommodate

2  under the WLAD on which Nelson has the burden of proof.

3         In discrimination cases under the WLAD, summary judgment is often

4  inappropriate because the WLAD "mandates liberal construction," *Martini v. Boeing Co.*,

5  137 Wn.2d 357, 364 (1999); RCW 49.60.020, and the evidence "will generally contain

6  reasonable but competing inferences of both discrimination and nondiscrimination that

7  must be resolved by a jury." *Davis v. West One automotive Group*, 140 Wn. App. 449,

8  456 (2007).  Courts will, however, grant summary judgment when the plaintiff fails to

9  raise a genuine issue of fact on one or more prima facie elements.  *See, e.g., Hines v.*

10  *Todd Pacific Shipyards Corp.*, 127 Wn. App. 356 (2005).

11         To establish a prima facie case of failure to reasonably accommodate a disability,

12  a plaintiff must show that (1) the employee had a sensory, mental, or physical

13  abnormality that substantially limited his or her ability to perform the job; (2) the

14  employee was qualified to perform the essential functions of the job in question; (3) the

15  employee gave the employer notice of the abnormality and its accompanying substantial

16  limitations; and (4) upon notice, the employer failed to affirmatively adopt measures that

17  were available to the employer and medically necessary to accommodate the abnormality.

18  *Davis v. Microsoft Corp.*, 70 P.3d 126, 131 (Wash. 2003).  TMX argues that Nelson has

19  failed to raise a genuine issue of fact on the first and fourth elements of the claim.

20

21

22

**a.    Whether the Plaintiff Had a Sensory, Mental, or Physical Abnormality That Substantially Limited His Ability to Perform the Job**

Under RCW 49.60.040(25)(a), a "disability" is "the presence of a sensory, mental, or physical impairment that: (i) is medically cognizable or diagnosable; or (ii) exists as a record or history; or (iii) is perceived to exist whether or not it exists in fact."  An employee qualifies for reasonable accommodation if he or she has an impairment that substantially limits his or her ability to perform the job, or the employer has notice of the impairment and medical documentation establishes "a reasonable likelihood that engaging in job functions without an accommodation would aggravate the impairment to the extent that it would create a substantially limiting effect."  RCW 49.60.040(25). Plaintiff bears the initial burden "to demonstrate that his disability requires accommodation in order for him to perform his job adequately."  *Lindblad v. Boeing Co.*, 108 Wn. App. 198, 204 (2001).

TMX argues that when Nelson was assigned to the second shift, he had no "substantially limiting" disability and thus no condition for which an accommodation was "medically necessary."  Dkt. 42 at 20.  Nelson declares that he met with his doctor on August 3, 2010 and informed the doctor that his medication was making him "really tired in the afternoon" and that "twice had run off the road" with his vehicle and "once got stopped for a DUI but hadn't been drinking."  Dkt. 45-1 at 41.  However, there is *no* evidence in the record to show that Nelson was unable to perform his job adequately. Nelson's complaint was that "he could not meet the prescription regimen imposed by his physician."  Dkt. 46 at 6.  Inability to meet a prescription regimen is not a showing that

1   coronary artery disease impairs one's ability to perform the job.  Therefore, the Court

2   grants TMX's motion because Nelson has failed to show that he "had a sensory, mental,

3   or physical abnormality that substantially limited his or her ability to perform the job."

4           **b.    Whether the Employer Failed  to Affirmatively Adopt Measures**
                 **That Were Available to the Employer and Medically Necessary**
5                **to Accommodate the Abnormality**

6           "Reasonable accommodation . . . envisions an exchange between employer and

7   employee where each seeks and shares information to achieve the best match between the

8   employee's capabilities and available positions."  *Goodman v. Boeing Co.*, 127 Wn.2d

9   401, 408–09 (1995).

10          Even if Nelson was able to show a substantially limiting impairment, Nelson has

11  failed to show that TMX failed to reasonably accommodate his impairment in August or

12  September 2010.  First, there is evidence in the record that TMX accommodated Nelson's

13  medical requests in January 2008 and January 2009, which suggests that TMX was

14  willing to engage Nelson in an exchange to achieve the best accommodation.

15          Second, Nelson's August 3, 2010 doctor's note explicitly "suggest[s] that for

16  medical reasons John work traditional day shift, and that he avoid if at all possible swing

17  and graveyard shift."  Dkt. 45-17.  On September 17, 2010, Nelson submitted a

18  resignation letter stating that it had been three weeks since he provided his doctor's note

19  and had received nothing back from management.  Dkt. 45-1 at 48–49.  The Court finds

20  that no reasonable juror would conclude that notifying an employer of a suggested work

21  schedule and not receiving a response for three weeks equates to a failure to

22  accommodate.

1    Third, TMX did respond after receiving the resignation letter.  Nelson concedes

2 that a conference call with TMX's HR coordinator, Ramsey, occurred on September 10,

3 2010.  TMX contends that Ramsey informed Nelson that his current shift was temporary

4 and offered to accommodate a shift change instead of Nelson's resignation, but Nelson

5 refused the offer.  Nelson provides no facts to contest these contentions.  Similarly, the

6 Court finds that no reasonable juror could conclude that TMX failed to reasonably

7 engage in an exchange with Nelson or failed to accommodate Nelson, especially in light

8 of the facts that TMX offered reasonable accommodations while Nelson was still

9 employed and Nelson worked the later shift without evidence of impaired function or

10 inability to perform his required duties[1].  Therefore, the Court grants TMX's motion on

11 Nelson's WLAD failure to accommodate claim.

12                                        **IV. ORDER**

13    Therefore, it is hereby **ORDERED** that TMX's motion for summary judgment

14 (Dkt. 42) is **GRANTED.** The clerk shall close this case and enter judgment for

15 Defendant against Plaintiff.

16    Dated this 20th day of March, 2013.

17

18

19    _____
      BENJAMIN H. SETTLE
      United States District Judge

20    _____

21    [1] Nelson declares only (1) that he informed TMX that the shift would aggravate his
      medical condition.  Dkt. 48 at 6 ll. 5–6.  Although he suffered some health issues (drowsiness
      and inability to stay awake), he fails to declare that he communicated these conditions to TMX.
22    *Id*. ll. 17–22.

ORDER - 14